# In the United States Court of Appeals For the Eighth Circuit

UNITED STATES OF AMERICA,

APPELLEE,

V.

WAKINYAN WAKAN MCARTHUR,

APPELLANT.

*Appeal from the*
*United States District Court for the*
*District of Minnesota*

## BRIEF OF APPELLEE

ERICA H. MACDONALD
  *United States Attorney*

DAVID M. GENRICH
  *Assistant U.S. Attorney*

*U.S. Attorney's Office*
*District of Minnesota*
*600 U.S. Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*
*(612) 664-5600*

Attorneys for Appellee

# SUMMARY OF THE CASE

Wakinyan McArthur led the Native Mob, an extremely violent criminal enterprise. McArthur's racketeering and drug distribution crimes spanned years and victimized individuals and communities across the State of Minnesota.

Following a six-week trial, McArthur was convicted of racketeering and drug offenses, as well as firearm offenses since vacated on legal grounds. This matter has twice been remanded for resentencing in light of the vacated counts. The district court has now sentenced McArthur to 420 months' imprisonment, a substantial downward variance from the guidelines range of 960 months.

McArthur contends in this sentencing appeal that the district court committed clear error by finding him responsible for between 1,000 and 3,000 kilograms of marijuana, by finding that he maintained a stash house, and by finding that he committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood.

The issues are adequately addressed in the parties' briefs, and no oral argument is necessary.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE.................................................................i

TABLE OF AUTHORITIES ................................................iv

STATEMENT OF THE ISSUES .........................................1

STATEMENT OF CASE ......................................................2

I.    Factual Background ...................................................2

    A.    The Native Mob ................................................3
    B.    McArthur and Native Mob Drug-Trafficking....................6

II.    Procedural History.....................................................26

    A.    Indictment....................................................26
    B.    Trial Proceedings.........................................26
    C.    First Sentencing Proceeding ...............................27
        1.    Overview of Sentencing Proceedings Pertinent to This Appeal.........................................27
        2.    Drug Quantity, Stash House, and Criminal Livelihood Determinations ...................................29

    D.    First Appeal ................................................33
    E.    First Remand and Resentencing .....................................34
    F.    Second Appeal................................................36
    G.    Second Remand and Resentencing...................................37

SUMMARY OF THE ARGUMENT ...................................40

ARGUMENT ................................................................42

I.    The District Court Did Not Clearly Error In Its Drug Quantity Findings. ...............................................42

    A.    Standard of Review .........................................42
    B.    The District Court Committed No Clear Error................42

Appellate Case: 20-1487    Page: 3    Date Filed: 06/01/2020 Entry ID: 4918847

II.   The District Court Did Not Clearly Err In Finding That
      McArthur Maintained A Premises For Manufacturing And
      Distribution Of A Controlled Substance.................................. 49

      A.   Standard of Review ............................................ 49
      B.   The District Court Committed No Clear Error............... 49

III.  The District Court Did Not Clearly Err In Finding That
      McArthur Committed The Offenses As Part Of A Pattern
      Of Criminal Conduct. ................................................. 54

      A.   Standard of Review ............................................ 54
      B.   The District Court Committed No Clear Error............... 54

IV.   Unless The District Court Cumulatively Erred By More
      Than Six Offense Levels, Any Error Is Harmless.................... 58

CONCLUSION.................................................................... 61

CERTIFICATE OF COMPLIANCE.................................................. 61

Appellate Case: 20-1487     Page: 4     Date Filed: 06/01/2020 Entry ID: 4918847

# TABLE OF AUTHORITIES

## *Cases*

*Ramey v. United States*, 8 F.3d 1313 (8th Cir. 1993) .........................48

*United States v. Allen*, 440 F.3d 449 (8th Cir. 2006).........................42

*United States v. Ault*, 446 F.3d 821 (8th Cir. 2006) ..........................44

*United States v. Berry*, 930 F.3d 997 (8th Cir. 2019) .........................54

*United States v. Bradley*, 643 F.3d 1121 (8th Cir. 2011) ...................43

*United States v. Darden*, 70 F. 3d 1507 (8th Cir. 1995)...............43, 46

*United States v. Davis*, 139 S. Ct. 2319 (2019).........................2, 37, 38

*United States v. Garcia*, 774 F.3d 472 (8th Cir. 2014) .......................49

*United States v. Hawkins*, 866 F.3d 344 (5th Cir. 2017)....................58

*United States v. Mannings*, 850 F.3d 404 (8th Cir. 2017)..................42

*United States v. Martinez*, 821 F.3d 984 (8th Cir. 2016) ...................59

*United States v. Mashek*, 406 F.3d 1012 (8th Cir. 2005)....................59

*United States v. McArthur*, 784 F. App'x 459 (8th Cir. 2019)........2, 37

*United States v. McArthur*, 836 F.3d 931 (8th Cir. 2016) ..................33

*United States v. McArthur, et. al*, 850 F.3d 925 (8th Cir. 2017)......2, 3

*United States v. Miller*, 698 F.3d. 699 (8th Cir. 2012) .......................51

*United States v. Morris*, 791 F.3d 910 (8th Cir. 2015) .......................57

iv

*United States v. Payton*, 636 F.3d 1027 (8th Cir. 2011) .............. 43, 46

*United States v. Sykes*, 854 F.3d 457 (8th Cir. 2017) ......................... 60

*United States v. Walker*, 688 F.3d 416 (8th Cir. 2012) ...................... 44

*Williams v. United States*, 503 U.S. 193 (1992) ................................. 60

## ***Statutes***

29 U.S.C. § 206(a)(c) ........................................................................ 55

## ***Sentencing Guidelines***

U.S.S.G. § 1B1.3 ............................................................................... 48

U.S.S.G. § 1B1.3(a)(1)(A) ............................................................... 43

U.S.S.G. § 1B1.3(a)(1)(B) ............................................................... 44

U.S.S.G. § 2D1.1 ......................................................................... passim

U.S.S.G. § 2D1.1(b)(12) ....................................................... 29, 49, 50

U.S.S.G. § 2D1.1(b)(14) .................................................................. 30

U.S.S.G. § 2D1.1(c) ................................................................... 18, 42

U.S.S.G. § 4B1.3 .............................................................................. 55

v

## STATEMENT OF THE ISSUES

**I.   Did the district court clearly err in making its drug quantity finding?**

*United States v. Darden*, 70 F. 3d 1507 (8th Cir. 1995)
*United States v. Bradley*, 643 F.3d 1121 (8th Cir. 2011)
*United States v. Payton*, 636 F.3d 1027 (8th Cir. 2011)

**II.   Did the district court clearly err in finding that McArthur maintained a premises for manufacturing and distribution of a controlled substance?**

*United States v. Miller*, 698 F.3d. 699 (8th Cir. 2012)

**III.   Did the district court clearly err in finding that McArthur committed the offenses as part of a pattern of criminal conduct?**

*United States v. Morris*, 791 F.3d 910 (8th Cir. 2015)

**IV.   Was any error harmless?**

*United States v. Sykes*, 854 F.3d 457 (8th Cir. 2017)

1

## STATEMENT OF CASE

### I.     Factual Background

Wakinyan McArthur led the Native Mob, a murderous street gang, for years.  Following a six-week trial that chronicled McArthur's terrorizing of individuals and communities, he was convicted of racketeering, drug, and gun offenses.[1]

The factual background summary below begins with an overview of the Native Mob's purpose and structure.  It then focuses upon the drug-trafficking conduct at issue in this appeal.  The drug-trafficking conduct at issue here is only a portion of McArthur's criminal endeavors.   A comprehensive review of the criminal enterprise conducted by McArthur and his associates is found in the Third Revised Presentence Investigation Report, DCD 1954 at ¶¶ 32-306.

---

[1] The firearms offenses, which alleged conspiring to use, and using, firearms in furtherance of crimes of violence, were subsequently vacated on legal grounds.  *See United States v. McArthur, et. al*, 850 F.3d 925, 931-32 (8th Cir. 2017) (vacating § 924(c) count and remanding for resentencing with agreement of the government on legal grounds); *United States v. McArthur*, 784 F. App'x 459, 461 (8th Cir. 2019) (unpublished) (vacating § 924(c) count and remanding for resentencing with agreement of the government in light of the Supreme Court's decision in *United States v. Davis*).  The conduct underlying those counts, as proven at trial, remained part of the record upon which the district court could rely at sentencing.

Appellate Case: 20-1487     Page: 8     Date Filed: 06/01/2020 Entry ID: 4918847

This Court, in its first opinion in this matter, summarized the offense conduct underlying McArthur's racketeering, drug-trafficking, and firearm activities. *United States v. McArthur, et. al*, 850 F.3d 925, 931-32 (8th Cir. 2017). Trial transcript citations supporting the *McArthur* opinion's summary, and additional detail about McArthur's control of the Native Mob and his offense conduct, may also be found in the government's brief filed in the first appeal. *See United States v. McArthur, et.al*, Appeal Nos. 14-3335, 14-3336, 14-3337, Brief of Appellee at 3-34 *found at* 2016 WL 736962 at *3 - *34.

## A. The Native Mob

The Native Mob ("the NM") is a criminal street gang formed in South Minneapolis during the early 1990's. Government Trial Exhibit ("Exh.") 1; Trial Transcript ("TT") 2295-96, 3603, 5962-63.[2] Over the years, the NM expanded in size and prominence, and by trial NM membership was estimated at over 200 individuals. TT 5119-20, 5629, 5970, 5968.

---

[2] The trial transcripts are consecutively paginated and found at DCD 1487-1546.

3

To serve its goals, the NM adopted the purposes and structure of an ongoing criminal enterprise. At first, the NM's primary function was the protection of the gang's drug-distribution territory in and around South Minneapolis. TT 144, 2260, 2298, 4009-10, 4567, 5944. As drug-distribution expanded with the NM's growth into outstate Minnesota, NM members were expected to share sources for illegal drugs (TT 3311, 4929, 5347), and drug trafficking was encouraged by the NM to generate money for members and to fund the purchase of firearms for the benefit of all members of the NM. TT 3699-3700.

The NM's drug distribution activities were joined with other goals. The NM, for example, sought to protect its turf. TT 1043-46, 1419-23, 1761-68, 2210-15, 2220-24, 2561-63, 2917-21, 3111, 3348-57, 4064-67, 4085-91. To that end, the NM acquired, stashed, distributed, and used firearms for the benefit of the gang. TT 144, 1101, 1106-07, 1875, 2239, 2325-26, 2376, 3322-25, 4927, 5641.

The NM also had established leadership positions. The NM was led by a "Chief," who had the final say in all matters. Exhs. 8, 47, 61, 89 (NM By-Laws). Numerous witnesses identified McArthur as Chief or "Ogema" of the NM during relevant times of the conspiracies alleged

4

in the indictment. TT 2335-36, 3302-07, 3625, 5158, 5711. As the NM expanded, it created representatives, called "Reps," to oversee NM members within particular geographic regions in Minnesota. TT 2237-38, 3306, 3611. Reps were responsible for the discipline of members, recruiting new members, and holding regional NM meetings. TT 1110-11, 2332-33, 3306, 3611, 5128.

Christopher Wuori was identified both as "Treasurer" for the NM and "Rep" for the Cass Lake area of northern Minnesota. TT 3797, 5711, 5168; Exh. 499.

The NM's enterprise was also supported by non-members associated with the gang. Individuals who were not members but acted for the benefit of the gang and reaped benefits from their connection to the NM were referred to as "shorties" or as being "associated with" the NM. TT 2014-15, 2363, 3348, 4813, 4922-23, 5737-39, 4416-17. Shorties or associates might hold or sell drugs for the NM, sell guns to or hold guns for the NM, commit shootings on behalf of the gang, and/or be protected by the NM. *Id.*

NM members were expected to act for the benefit of the gang. For example, members furthered the enterprise by committing crimes,

Appellate Case: 20-1487    Page: 11    Date Filed: 06/01/2020 Entry ID: 4918847

referred to as "putting in work." TT 2391, 3304-05, 3621, 4931. The crimes included violence against rival gang members (TT 3336, 3349, 3621, 4931, 5126, 5202-03), robberies (TT 3362-63, 5126), drug dealing (TT 3621, 5126), and violence against members who violated the enterprise's rules (TT 1119).

### B.    McArthur and Native Mob Drug-Trafficking

Trial evidence, including the testimony of several cooperating NM members, established that Appellant was engaged in drug trafficking in connection with the NM. Dale Pindegayosh, a/k/a "J.P.", testified that he joined the NM in 2005 while in a Minnesota prison. TT 5629. Upon his release in 2009, he returned to Cass Lake and continued to associate with the enterprise, attending NM council meetings organized by McArthur and the NM "Rep" for Cass Lake, Christopher Wuori. TT 5631-33. Pindegayosh testified that selling drugs was one way of "putting in work" for the NM. TT 5636.

During the time frame of the conspiracies alleged, Pindegayosh made drug runs to Minneapolis with McArthur and Wuori to purchase cocaine. TT 5682. He testified that McArthur "pooled" his money and went "half and half" on these drugs with Wuori, and that McArthur

6

went on several of these drug runs to Minneapolis. TT 5682-83. Pindegayosh estimated that he made 15 such runs to pick up cocaine, and on occasion, drop off NM firearms. TT 5679-80. The quantities of cocaine involved anywhere from 9 ounces to one kilogram of cocaine.[3] TT 5679-80. Pindegayosh and McArthur discussed the NM drug business, including which sources had "work" (cocaine) for them. *Id.*

Pindegayosh testified that the powder cocaine was brought to Cass Lake where Wuori would convert it into cocaine base - often at the "White House" on Maple Avenue in Cass Lake – a residence "where Kon [McArthur] and Chris [Wuori] were sharing a house." TT 5642. He observed McArthur at the house when Wuori cooked the cocaine into crack. TT 5683. Pindegayosh observed "a lot of variety of firearms" at the White House, including .380 handguns and pistol-grip shotguns. TT 5644-45.

Pindegayosh also testified that it was common for other NM members to be present at the White House. TT 5561. Pindegayosh

---

[3] Nine ounces of powder cocaine is 252 grams. The cocaine base equivalent is 14 grams while the marijuana equivalent is 49 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D). Fifteen trips therefore generates the cocaine base equivalent of 210 grams and a marijuana equivalent of 735 kilograms.

Appellate Case: 20-1487    Page: 13    Date Filed: 06/01/2020 Entry ID: 4918847

recounted a particular occasion in February of 2011 when he met McArthur and Wuori at the White House where the three NM members discussed a recently executed federal search warrant and McArthur's resulting suspicions that NM member Jeremee Kraskey had aided law enforcement in obtaining the warrant. McArthur was "storming around" the house saying "there's paperwork" on Kraskey. TT 5693-94. Trial evidence showed that Kraskey was murdered one week later after being summoned to Minneapolis from Cass Lake by NM leadership. TT 5695-5709. Kraskey was shot once in the back of the head and twice in the abdomen. TT 3011-25, 4357-75, Exhs. 729, 730, 732, 734,735, 736.

Pindegayosh estimated that between 2010 and his own federal arrest in early 2012, he obtained three to four pounds (1360 to 1814 grams) of cocaine base[4] from Wuori. TT 5678. Pindegayosh testified that he sold these drugs in smaller quantities, to include "dubs" (a half-gram quantity), grams, 8-balls (3.5 grams), or half-ounces (14 grams). TT 5676-77.

---

[4] 1360 grams of cocaine base has a marijuana equivalent of 4760 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 20-1487     Page: 14     Date Filed: 06/01/2020 Entry ID: 4918847

Pindegayosh testified that, in addition to himself, Wuori distributed crack cocaine to other NM members, including Anthony Cree (TT 5686), NM "enforcer" Justin Poitra, and NM member Eric Bower who, in turn, sold these drugs on the White Earth Indian Reservation in Minnesota. TT 5687-88. Corroborating this testimony was evidence presented during trial that 11 grams of cocaine base[5] was found in Bower's apartment on the White Earth Indian Reservation at the time of his federal arrest in January of 2012. Exh. 835., TT 2975.

Pindegayosh testified that in the spring of 2011, he received a quarter-ounce of heroin from Wuori who instructed Pindegayosh to sell the heroin on the Red Lake Indian Reservation in northern Minnesota. TT 5715-5717. Pindegayosh and NM member Aaron Gilbert, a/k/a "Fatboy", sold the NM heroin on Red Lake for a week. The two men returned to Cass Lake and provided Wuori with the proceeds from the heroin sales. Pindegayosh was allowed to keep "a couple hundred dollars" from these heroin sales. Wuori told Pindegayosh that he planned to re-invest the proceeds from the heroin

---

[5] 11 grams of cocaine base has a marijuana equivalent of 38 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 20-1487      Page: 15      Date Filed: 06/01/2020 Entry ID: 4918847

sales in the purchase of more cocaine. TT 5724. Pindegayosh and Gilbert then returned to Red Lake to sell more NM heroin but were arrested by tribal police. Trial evidence included 1.3 grams of heroin packaged in cut plastic straws thrown from Pindegayosh's vehicle during his arrest. Exh. 749.

NM "War Chief" Kenny Roberts testified that after McArthur's release from prison in 2009, McArthur instructed him to bring all NM members from Minneapolis to Cass Lake for a statewide NM council meeting. TT 2327-28. McArthur wanted to "bring [the NM] name back to the community…as far as like, you know, selling drugs" and "getting at our enemies." TT 2331. At this meeting, the NM resolved to eliminate any existing threats to the gang. *Id.*; Exh. 242.

Roberts testified that in the spring of 2010, McArthur asked him to store 9 ounces of powder cocaine[6] at Roberts' mother's house in Minneapolis. TT 2354. Roberts also brought three different customers directly to McArthur to purchase crack cocaine. *Id.* This included one occasion when Roberts brought his cousin to the White

---

[6] Nine ounces is 252 grams of powder cocaine. The cocaine base equivalent is 14 grams and the marijuana equivalent is 49 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 20-1487     Page: 16     Date Filed: 06/01/2020 Entry ID: 4918847

House in Cass Lake to buy 28 grams of crack from McArthur who charged "between $1200 and $1400" for the cocaine base. TT 2355. Roberts described another occasion when McArthur removed an ounce (28 grams) [7] of cocaine base out of a closet at the White House then sold it to Roberts' associate. TT 2355.

Roberts testified that during the 2009-2010 timeframe, McArthur and Wuori supplied crack cocaine to him more than ten times in quantities ranging from 3.5 grams to 28 grams.[8] TT 2343-45. Roberts also saw McArthur and Wuori supply NM associate David Bower with two "8-balls" (7 grams) of cocaine base in 2009 (TT 2439, 3739) and he saw McArthur give one ounce of methamphetamine[9] and a 9mm pistol to NM member Stirling Heaton after a NM meeting in

---

[7] These two ounces equal 56 grams of cocaine base, which has a marijuana equivalent of 196 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

[8] Using the smallest quantity (3.5 grams), this totals 35 grams of cocaine base supplied to Roberts by McArthur and Wuori, which has a marijuana equivalent of 122 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

[9] One ounce is 28 grams. The marijuana equivalent of 28 grams of methamphetamine is 56 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 20-1487     Page: 17     Date Filed: 06/01/2020 Entry ID: 4918847

the summer of 2010. TT 2426. "Off the top of [his] head" Roberts identified Anthony Cree, Dwight Jones, Matthew Poitra, and Justin Poitra as other NM members who were supplied crack cocaine by McArthur and Wuori. TT 2351.

Roberts testified that McArthur and Wuori stored their drugs at the White House in Cass Lake. TT 2346-47. He witnessed McArthur and Wuori exchanging crack cocaine with each other in this residence on five or six occasions and he observed Wuori cooking "a lot of cocaine into crack" at the White House, testifying "I seen [Wuori] there all day cooking, so it had to have been at least eight to nine ounces at a time." TT 2346 – 48. He testified that the preparation of crack cocaine "was common knowledge of everybody who has been at the house…." TT 2349. Roberts recounted that McArthur and several other NM members were often present when Wuori converted the powder cocaine into crack cocaine and that he had assisted Wuori in packaging the crack for sale in the White House in the spring of 2010. TT 2349.

NM member Dwight Jones testified that McArthur and Wuori sold crack cocaine together in Cass Lake during the conspiracies alleged. Between 2009 and 2010, Wuori supplied Jones with at least

Appellate Case: 20-1487    Page: 18    Date Filed: 06/01/2020 Entry ID: 4918847

four ounces (112 grams) of crack cocaine that belonged to both McArthur and Wuori, recalling statements Wuori made when collecting drug debts, such as "Kon [McArthur] wants the money" or "Kon is asking [me] to come get the money." TT 4584.[10] Jones identified Cree as selling 8-ball quantities of crack cocaine in Cass Lake that Wuori had supplied. TT 4585-4586. Jones himself sold the crack supplied by McArthur and Wuori to others in the Cass Lake area, including other NM members. TT 4578-4581.

Jones identified the White House as a residence in Cass Lake used by McArthur and Wuori to operate their drug business. TT 4579. On one occasion, McArthur accessed a safe in the bedroom of the White House and provided crack cocaine to Jones. TT 4644. Jones saw Wuori using the microwave oven at the house to cook powder cocaine into crack. On some of these occasions, McArthur was present. On one occasion in particular, he witnessed Wuori hand a "couple of ounces"

---

[10] 112 grams of cocaine base has a marijuana equivalent of 392 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

Appellate Case: 20-1487    Page: 19    Date Filed: 06/01/2020 Entry ID: 4918847

(56 grams) of cocaine base[11] to McArthur that Wuori had just cooked up in the kitchen of the White House.  TT 4580-83.

Jones also observed handguns and a rifle at the White House. *Id.*  Jones testified that he was present in the White House in 2009 when McArthur and Wuori issued an order to other NM members that the rival drug dealer, Lawrence Daniels, a/k/ "Sonic", was "on sight" – meaning targeted to be shot.  TT 4607-08.

NM member Bear Conway testified at trial that he had been a member of the NM since 2000, having been recruited into the organization at age 17 by his uncle, Gordon Reese.  TT 3601-02.  He continued his association with the NM until 2010, when he began to work as an informant for law enforcement.  Conway testified that selling drugs, committing drive-by shootings, and assaulting people were ways to maintain status within the organization and that all of these topics were discussed at NM council meetings led by McArthur. TT 3621-23, 3745.  Conway testified that Wuori trafficked both powder and crack cocaine and that he was with Wuori on two occasions when

---

[11] 56 grams of cocaine base has a marijuana equivalent of 196 kilograms.  *See* U.S.S.G. Section 2D1.1 n.8(D).

14

Wuori obtained cocaine from a source of supply. TT 3745-47. Conway had also observed Wuori cooking powder cocaine into crack cocaine on two occasions using the microwave in the kitchen of Wuori's house in Cass Lake. TT 3745.

Mike Hecimovich, a/k/a "Dope Boy", testified that he joined the NM while serving a 3-year prison sentence in Minnesota. When he was released from prison in 2009, he continued to associate with NM members and to participate in the racketeering enterprise by committing robberies, shootings, and selling illegal drugs. TT 5140. Hecimovich testified that McArthur discussed NM drug trafficking during "a couple" of NM council meetings (TT 5355) and that "selling dope" was the primary way that NM members made money. TT 5346.

Hecimovich identified Wuori as a primary source for crack cocaine. *Id.* Wuori brought crack cocaine from Cass Lake to Minneapolis to supply the co-chief of the NM, Shawn Martinez. TT 5353-54. Hecimovich, in turn, purchased 3.5 gram and 7-gram quantities of crack from Martinez during the conspiracies alleged. In addition to the crack cocaine, Hecimovich sold at least one pound (453 grams) of methamphetamine during his tenure with the NM. TT 5353.

15

"Three and half, maybe four ounces" of this methamphetamine was obtained through armed robbery committed with other members of the NM, including the co-chief of the NM, Shawn Martinez and NM member Mayson Lueck. TT 5285-90, 5351.[12] Hecimovich testified that he and the other NM members split the stolen methamphetamine each member taking a half to three-fourths of an ounce of the robbery's proceeds. *Id.* This was only one of several armed robberies committed with members of the NM during the conspiracies alleged. TT 5262.

NM member Mayson Lueck testified that he joined the NM in early 2010 and that McArthur was Chief of the NM during this time. TT 3302-07. Lueck said that he "put in work" for the NM by selling drugs and committing assaults. TT 3304. Lueck first met Wuori at a NM council meeting in June of 2010 and within two months had purchased 48 grams of crack cocaine from him. TT 3310-11, Exh. 595. In a separate transaction in 2010, Lueck obtained 70 grams of crack cocaine from Wuori which he, Cory Oquist, and two other NM members then sold on a reservation in Wisconsin, then shared the

---

[12] 112 grams of cocaine base has a marijuana equivalent of 392 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

16

proceeds. TT 3314-15. Lueck admitted that he participated in an armed robbery in 2010 with NM co-chief Shawn Martinez, Hecimovich, and a third NM member in which they obtained a multi-ounce quantity of methamphetamine. TT 3362.

Lueck had observed Wuori cooking 28 grams of crack[13] at the White House in Cass Lake in 2010 while McArthur and several other NM members, including Jeremee Kraskey and Cory Oquist were present. TT 3312-13. Lueck testified that he had seen McArthur at the White House on other occasions as well. TT 3317-18. Lueck observed firearms at the White House, including a mini 14 rifle and a 9mm pistol located under a couch. TT 3317.

Justin Hollins testified that he participated in trafficking powder cocaine in Minneapolis in late 2009 through 2010. Hollins met Wuori through Hollins' partner, Fields. TT 5475. Hollins testified that from December of 2009 until June or July of 2010, Wuori travelled to Minneapolis every three weeks to purchase between 5 and 10

---

[13] 28 grams of cocaine base has a marijuana equivalent of 98 kilograms. *See* U.S.S.G. Section 2D1.1 n.8(D).

ounces of powder cocaine[14] from him and that McArthur accompanied Wuori on at least one of these trips. TT 5475-77.

Randall Seelye testified that he was recruited into the NM by McArthur in 2006. TT 4918-19. When both men were out of prison they engaged in criminal activity together "focused around dope and pistols." TT 4920. Seelye described pooling his money with McArthur and other Native Mob members to jointly purchase 9 ounces of cocaine from a relative of NM member Gordon Reese's during the time frame of the conspiracy.[15] This cocaine was brought to the Cass Lake area for further distribution by members of the NM. TT 4923-25.

Seelye also testified about the May 2011 controlled buy of 3.6 grams of crack cocaine from McArthur and Wuori in Cass Lake,

---

[14] Five to ten ounces is 140 to 280 grams of powder cocaine. The marijuana equivalent would be 28 to 56 kilograms per trip. *See* U.S.S.G. Section 2D1.1 n.8(D). For a seven-month period (December through June), this totaled between 196 and 392 kilograms of marijuana.

[15] Nine ounces of powder cocaine is 252 grams of powder cocaine, which has a marijuana equivalent of 98 kilograms. *See* U.S.S.G. Section 2D1.1(c) (drug quantity table).

18

Minnesota. TT 4801-14, Exh. 763.[16] Approximately one month later, Seelye conducted another controlled purchase of 6 grams of crack cocaine from Wuori at the White House on Maple Avenue. TT 4814-16, Exh. 765.

Amanda Carlson testified that McArthur, Wuori, and members of the NM were trafficking heroin and other drugs in addition to the cocaine base described above. Carlson testified that she had been receiving "pain pills" from members of the NM in Cass Lake, who then directed her to specific customers. TT 4280-82. Carlson testified that in late March of 2011, she met McArthur, Wuori, and NM member Alden Fairbanks, a/k/a "Bro", at a house in Cass Lake. She observed Wuori cutting and filling plastic straws with a brown powder consistent with heroin. TT 4288-89, 4293. With McArthur present, Wuori asked her to sell the heroin because "it's better than pills" and was cheaper. TT 4293. Approximately one week after this meeting with McArthur, Wuori, and Fairbanks, a search warrant was executed at Carlson's trailer home in Cass Lake. NM member Fairbanks was

---

[16] This is the conduct underlying overt act KKK in Count 1 and the substantive allegation contained in Count 8.

Appellate Case: 20-1487    Page: 25    Date Filed: 06/01/2020 Entry ID: 4918847

present and when searched, officers found 14 cut straws containing 2.5 grams of heroin in his pocket as well as a handgun. Exh. 756, TT 4754-55. Elsewhere in Carlson's home, officers found a large quantity of empty cut plastic straws consistent with those used to package the heroin found in Fairbanks' pocket. Exh. 762.

In February of 2011, law enforcement executed a search warrant for gang documents at 316 Maple Avenue in Cass Lake – the location commonly referred to as the White House. McArthur and his girlfriend were the only ones present. TT 4765-66. No drugs were found at that time, but officers seized an number of NM-related items including a MoneyGram receipt showing a money transfer between the former NM leader Wambli McArthur and Wuori (Exh. 702), a t-shirt with the words "I rep Cass Lake Mafia World, NM" on it (Exh. 703, TT 4769), photographs of NM members throwing NM gang signs with their hands (Exh. 706), a packet of police reports related to NM member William Morris' boiling-water assault against suspected informant Richie Norton (Exh. 709), a criminal complaint and

Appellate Case: 20-1487    Page: 26    Date Filed: 06/01/2020 Entry ID: 4918847

summons for NM member Cory Oquist, a/k/a "Guns"[17] (TT 5569, Exh. 710), a duffel bag containing an inmate property sheet and social security card for NM member Pedro "P.J." Sayers (Exhs. 711, 720), and a mailing to McArthur himself from federal inmate and NM member Anthony Smith dated January 5, 2011 (Exh. 712) in which Smith discussed NM-related business. TT 4773-74.

During trial, the jury also heard evidence of McArthur and Wuori's efforts to drive away drug competition in the areas that the NM sold their drugs. This included the NM's attempted murder of the rival drug dealer named Lawrence Daniels, a/k/a "Sonic." Daniels was operating on the same turf as the NM. TT 2344-50, 5648-49, 5680-83.

Roberts explained that in 2010, McArthur, Wuori, and he discussed Daniel's drug trafficking in NM territory. TT 2399-2401. McArthur and Wuori planned to find out where Daniels was living and

---

[17] When Oquist was arrested at a search warrant in November of 2011 by the Leech Lake Tribal Police Department, he was in possession of one gram of crack cocaine. Exh. 800, TT 2162. Pindegayosh testified that Oquist was one of several NM members who sold crack supplied by Wuori and McArthur. TT 5676-77. Oquist also drove the NM members to the Wilke residence to do the home-invasion ordered by McArthur. TT 5720.

Appellate Case: 20-1487    Page: 27    Date Filed: 06/01/2020 Entry ID: 4918847

"eliminate him by any means and get him off, get him off Cass Lake."
TT 2403; *see also* TT 2404 (NM member Roberts recounting McArthur
and Wuori's goal to find Daniels and "eliminate the competition").
Jones testified that sometime in 2009 or 2010, while at the "White
House", McArthur told members of the NM it was "on sight" with
Daniels. TT 4608. Pindegayosh also testified that Daniels was a rival
drug dealer of the NM's and that the leadership's plan was to shoot
Daniels. TT 5648-52.

The NM's plan to "eliminate" Daniels as drug competition
resulted in several armed attempts on residences the NM believed
were associated with Daniels. After the two armed attempts on
Daniels' life in 2010, Daniels and his associates were still selling drugs
in the Cass Lake area in "direct competition" with the NM. TT 5718
(testimony of NM member Pindegayosh).

In addition to getting the word out to shoot Daniels on sight, the
Cass Lake Council, including McArthur and Wuori, decided the NM
would continue its efforts to protect its drug turf against Daniels,
including by home invasion. TT 5718-19. Pindegayosh, at McArthur
and Wuori's request (TT 5719), volunteered for the mission, joining

Appellate Case: 20-1487    Page: 28    Date Filed: 06/01/2020 Entry ID: 4918847

three NM members and a NM prospect (TT 5724). They went to the "weapons stash" and got firearms, ultimately carrying a total of three guns and a set of brass knuckles for the home invasion. TT 5719. NM member Cory Oquist was the driver for the group. TT 5720.

On March 28, 2011, Pindegayosh and the other NM members executed the home invasion on the residence of sixty-two year old John Wilke, a resident of Cass Lake and the father-in-law of Daniels. Daniels had lived with Wilke in the past (TT 5091), and in 2010 drugs and a gun had been seized by law enforcement at the residence (TT 3573-75). As the NM entered, they yelled "police," used firearms to threaten and assault Wilke, and demanded to know where "Sonic G's stuff was." TT 5092-94. After being told by Wilke that Daniels did not live there and had nothing stored there, the NM members rummaged through the house (TT 5094-95) saying "this is their territory, nobody is doing nothing around here but us." TT 5095.

During the June 11, 2011 council meeting, McArthur and Wuori discussed their shared sources for illegal drugs. Exh. 764. With Wuori present, McArthur said*: "*It's just we could (inaudible) give you our phone number and the connect we got now, really doesn't mean

Appellate Case: 20-1487    Page: 29    Date Filed: 06/01/2020 Entry ID: 4918847

nothing. Because, n****, we've ran into 5 or 6 different connects within the last five or six months…We haven't had the same connect the whole time." *Id.*

At trial, McArthur admitted that he was engaged in selling large quantities of marijuana during the conspiracies alleged and that he did so with NM member Jeremee Kraskey. TT 6466. He testified that after his release from prison, his "hustle" was to sell "pounds of marijuana" that he obtained from St. Paul, Minnesota. He estimated that the total quantity was "over 100 pounds"[18], which he then distributed on the reservations of northern Minnesota. TT 6402. McArthur testified that he applied for jobs upon his release from prison but "got denied." TT 6397. He testified that the tribe gave him a job but he lost it after violating parole and going back to prison. TT 6399.[19]

---

[18] 100 pounds of marijuana is the equivalent of 45 kilograms of marijuana.

[19] In addition to the trial evidence summarized herein, the district court adopted the Third Revised Presentence Report, which contained extensive factual summaries of McArthur's control of the NM and of McArthur and others NM members' drug-trafficking. DCD 1954, Third Revised PSR at ¶¶ 33-306; DCD 1973, Amended Statement of Reasons at 1 (adopting PSR).

Appellate Case: 20-1487    Page: 30    Date Filed: 06/01/2020 Entry ID: 4918847

He testified to no other legitimate income from the time he was released from prison after serving a sentence for murder and the time he was arrested in the present case. The Third Revised PSR showed a total income for the five-year period between release from state prison and federal arrest of just over $20,000. DCD 1954, Third Revised Presentence Investigation Report ("RPSR3") at ¶ 411.[20] Further, McArthur did not file income tax returns from 2008 to 2012. RPSR3 ¶ 414. As the Probation Office noted, "[t]he Native Mob was the defendant's life. As leader of the Native Mob he ensured fellow gang members sold drugs and engaged in violent criminal acts to maintain his leadership and lifestyle throughout the conspiracy." RPSR3 ¶ 344.

---

[20] The United States Probation Office has submitted four Presentence Investigation Reports for McArthur during the course of these proceedings. *See* McArthur PSR; DCD 1705, Revised McArthur PSR; DCD 1945, Second Revised McArthur PSR; DCD 1954, Third Revised McArthur PSR. The Third Revised PSR was prepared for the sentencing proceeding underlying this appeal. It does not differ from prior versions in ways that are material to this appeal.

## II. Procedural History

### A. Indictment

In January 2012, twenty-four (24) defendants were named in a forty-seven count Indictment. DCD 18. All twenty-four defendants were charged with Conspiracy to Participate in Racketeering Activity based upon their involvement with the NM, along with one or more additional conspiracy, violent crime, gun, and drug offenses. *Id.* In the end, all but the three defendants – McArthur and two of his co-defendants - resolved this matter with pleas of guilty.

Chief Judge John R. Tunheim presided over all district court proceedings in this matter.

### B. Trial Proceedings

In late January 2013, McArthur and two co-defendants proceeded to jury trial. DCD 978. For purposes of trial, a redacted Superseding Indictment was prepared and filed. DCD 1096. The redacted Superseding Indictment reflected only the counts relevant to McArthur and the two co-defendants and renumbered those counts consecutively. McArthur and the government use those count numbers throughout the briefing.

26

After six weeks of trial, the jury returned its verdicts in March 2013. DCD 1097. McArthur was convicted of Conspiracy to Participate in Racketeering Activity (Count 1); Conspiracy to Use and Carry Firearms During and in Relation to a Crime of Violence (Count 2); Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (Count 7); Distribution of a Controlled Substance (Count 8); and two counts of Use and Carrying of Firearm During and in Relation to a Crime of Violence (Counts 10 and 11).

## C. First Sentencing Proceeding

### 1. Overview of Sentencing Proceedings Pertinent to This Appeal

By way of overview, in each of McArthur's three sentencings in this matter, his advisory guidelines calculations included multiple counts divided into four groups. Those four groups are Count Group 1 (Attempted Murder in August 2010); Count Group 2 (Attempted Murder in September 2010); Count Group 3 (Attempted Murder in November 2010; and Count Group 4 (Drugs and Conspiracy Firearm Offense and Count1 Pseudo Counts for the Same Acts). Of those four groups, Group 4—the drug and firearm conduct—always generated

the greatest adjusted offense level and thus has driven the advisory guidelines range.

The Probation Office made three determinations with respect to the Group 4 adjusted offense level that are pertinent to this appeal. Those three determinations were: the drug quantity for which McArthur was responsible; a two-level "stash house" enhancement; and a two-level "criminal livelihood" enhancement. Those determinations were first made in connection with the original PSR and first sentencing proceeding, and they have remained unchanged throughout subsequent PSRs and sentencing proceedings.

McArthur objected to those three determinations in the original PSR (original sentencing) and in the revised PSR (first resentencing). The district court overruled those objections in the original sentencing proceedings and in the first resentencing. McArthur appealed those three guidelines findings in his first and second appeals, but they were not addressed because each time the case was remanded for resentencing on other grounds.

The same three findings were made by the district court in McArthur's latest resentencing, from which this appeal is taken.

Appellate Case: 20-1487    Page: 34    Date Filed: 06/01/2020 Entry ID: 4918847

McArthur again appeals those findings, reiterating the arguments previously made. The procedural history of those three findings, going back to the original sentencing, is accordingly reviewed below.

### 2. Drug Quantity, Stash House, and Criminal Livelihood Determinations

Following trial and before the first sentencing in this matter, the United States Probation Office prepared a Presentence Investigation Report ("First PSR"). Pertinent to this appeal, the Probation Office made three guidelines recommendations. Specifically, the Probation Office recommended:

- **<u>Drug Quantity</u>**: Based upon the trial evidence, the Probation Office determined that McArthur was responsible for trafficking 499 grams of cocaine and 279 grams of cocaine base. First PSR ¶ 338. That determination was consistent with the jury's determination that McArthur was responsible for less than 500 grams of cocaine and between 28 and 280 grams of cocaine base. *Id.*

  For guidelines purposes, 499 grams of cocaine and 279 grams of cocaine base converted to a total of 1,096.1 kilograms of marijuana. *Id.* Pursuant to §2D1.1(c)(4), the equivalent of between 1,000 and 3,000 kilograms of marijuana yielded a base offense level of 32. *Id.*

- **<u>Stash House</u>**: Based upon the trial evidence, the Probation Office recommended application of the two-level, "stash house" enhancement under U.S.S.G. § 2D1.1(b)(12). *Id.* at ¶ 341. The Probation Office concluded that McArthur maintained a premise for the purpose of manufacturing or

29

distributing a controlled substance, noting that McArthur was recorded encouraging members of the Native Mob gang to use his residence to prepare drugs for distribution. *Id.*

- **Criminal Livelihood**: Based upon the trial evidence, the Probation Office recommended application of the two-level enhancement for commission of the offense as part of a pattern of criminal conduct engaged in as a livelihood under U.S.S.G. § 2D1.1(b)(14). *Id.* at ¶ 342. The Probation Office noted that "[a]s the leader of the Native Mob he ensured fellow gang members sold drugs and engaged in violent criminal acts to maintain his leadership and lifestyle throughout the conspiracy." *Id.*

The parties filed written sentencing position pleadings with the district court. DCD 1381-82, 1402, 1408. McArthur objected to the drug quantity, stash house, and criminal livelihood recommendations. First PSR, Addendum at A.2 – A.6 (McArthur's objections to PSR); DCD 1382, 1408 (McArthur's Sentencing Memoranda). The government supported those recommendations. First PSR, Addendum at A.1 (noting no government objections to PSR); DCD 1381, 1402 (Gov't Sentencing Memoranda).

The district court held a sentencing hearing for McArthur in September 2014. McArthur's sentencing hearing began with an evidentiary hearing. DCD 1548, McArthur Sent. Tr. (hereafter "ST 1") at 4-72. The government called two witnesses, both of whom testified

30

about McArthur's continued NM-related activity while pending sentencing in this matter. *Id.* The testimony included evidence about an attempt—linked to McArthur through recorded jail phone calls—to smuggle methamphetamine into the jail, as well as the playing of recorded jail calls in which McArthur discussed ongoing NM activity. *Id.*

The district court received argument on guidelines calculations and the sentencing options available pursuant to statute. *Id.* at 72-99. McArthur incorporated by reference all of his written objections and specifically reiterated a number of them, including his objections to the Probation Office's drug quantity and stash house determinations. *Id.* at 78-80. The government similarly reiterated a number of its sentencing arguments, including as to the drug quantity and stash house determinations. *Id.* at 86-95, 97-99.

The district court denied McArthur's objections as to drug quantity, stash house, and criminal livelihood. *Id.* at 102-104, 106. As to drug quantity, the district court "overrule[d] the objection based on the evidence at the trial. The [c]ourt's finding is that the government proved that the conspiracy included the equivalent of between 1,000

31

and 3,000 kilograms of marijuana." *Id.* at 102. The district court concluded that it would "also overrule the objection concerning the enhancement for maintaining a stash house. There is abundant evidence that the house at issue was used for distributing drugs, storing drugs, cutting drugs. There was plenty of testimony concerning that." *Id.* at 103.

The district court concluded, under a multiple grouped count analysis, that the total offense level was 49 but reduced that to 43, referencing Chapter 5, Part A, Application Note 2. *Id.* at 106-07; *cf.* First PSR at ¶¶ 355-57. The court found that McArthur's Criminal History Category was III and that the resulting advisory guidelines range was life in prison. ST at 107; *cf.* First PSR at ¶ 416.

McArthur's counsel requested a total sentence that envisioned an "out date" for McArthur rather than a sentence of life in prison. *Id.* at 107-114, 118. The government, recounting McArthur leadership of the NM's profoundly violent enterprise and the present and future threat posed by McArthur to the safety of the community, requested a total sentence of life imprisonment. *Id.* at 114-117.

Appellate Case: 20-1487     Page: 38     Date Filed: 06/01/2020 Entry ID: 4918847

The district court imposed a sentence of 516 months' (43 years) imprisonment. *Id.* at 121-22. The district court noted the sentence was a downward variance from the advisory guidelines range of life imprisonment, giving McArthur an "out date." *Id.* at 122. The district court stated that the sentence was fashioned to balance the "enormity of these crimes, and they were enormous and well proven at trial in the Court's view" with a desire to give McArthur an "out date" as an incentive to focus on the future. *Id.* at 124.

### D. First Appeal

McArthur appealed his convictions and sentence to this Court. His convictions were affirmed with the exception of Count 11, one of two § 924(c) firearms counts. The Court granted the government's request to vacate the conviction on Count 11 on legal grounds and remanded the case for re-sentencing on all remaining counts under the "sentencing package doctrine." *See United States v. McArthur*, 836 F.3d 931, 947 (8th Cir. 2016).

As part of his first appeal, McArthur had alleged that the district court's drug quantity, stash house, and criminal livelihood determinations were erroneous. In light of the remand for

33

resentencing on all remaining counts under the sentencing package doctrine, this Court did not address those claims.

### E. First Remand and Resentencing

Following the first remand for resentencing, a Revised Presentence Report was prepared by the U.S. Probation Office. DCD 1705. The parties again filed written sentencing position pleadings with the district court. DCD 1710 (McArthur), 1714 (government). McArthur renewed his objections from the first sentencing proceeding, including his objections to the drug quantity, stash house, and criminal livelihood determinations. DCD 1710 at 3; DCD 1757, McArthur Re-Sentencing Tr. (hereafter ST 2) at 98.[21] The government continued to support those determinations. DCD 1757 at 6-13.

The district court held a two-day, re-sentencing hearing for McArthur on May 30, 2017, and May 31, 2017. ST 2 at 98. The re-sentencing hearing began with an evidentiary hearing. *Id*. at 4-72. The government offered exhibits probative of McArthur's NM-related activity since his 2014 federal sentencing. This included a packet of

---

[21] The transcripts of the re-sentencing hearing, found at DCD 1756 and 1757, are consecutively paginated and referred collectively herein as ST 2.

Appellate Case: 20-1487    Page: 40    Date Filed: 06/01/2020 Entry ID: 4918847

emails both written by, and sent to, McArthur while in Bureau of Prisons custody following his 2014 sentencing. Exh. 1. In one email communication, NM member Robin Lussier sought confirmation from McArthur that Lussier had been promoted within the ranks of the gang. *Id.* at 16. In another email, McArthur wrote Lussier boasting that he [McArthur] was "proud to be doing time" for the NM. *Id.* at 18. The witness also testified about recorded phone calls taking place between 2015 and 2017 in which various NM members discussed McArthur's on-going association within the NM criminal enterprise after his 2014 federal sentencing. *Id.* at 21-27.

After the evidentiary hearing, the district court moved to guidelines determinations. The district court confirmed that McArthur was asserting the same objections to the Revised PSR that he had asserted to the original PSR in the first sentencing proceeding. *Id.* at 98. McArthur confirmed his prior objections without further argument. *Id.* at 98. The district court again overruled them, without additional comment. *Id.*

The district court adopted the factual statements in the Revised PSR as its findings of fact and determined the advisory guidelines

35

range as life imprisonment. *Id.* at 99-100. The operative guidelines determinations—including as to drug quantity, stash house, and criminal livelihood—were identical to those made in connection with the first proceeding. *Id.*

The district court received argument from both counsel on the appropriate sentence. *Id.* at 100-117. McArthur's counsel requested a total sentence of 360 months' imprisonment. The government sought a sentence of at least 516 months' imprisonment—the sentence imposed in the first sentencing proceeding. *Id.* at 110-17.

The district court imposed a total sentence of 480 months' (40 years) imprisonment. *Id.* at 121-22. The district court noted the sentence was a downward variance from the advisory guidelines range of life imprisonment, noting "some level of post offense rehabilitation" and the elimination of Count 11. *Id.* at 142-43. The court further stated that it fashioned the sentence to account for concern regarding the "enormity of the crimes over a long period of time." *Id.* at 143.

## F.    Second Appeal

McArthur appealed the 480-sentence imposed in the re-sentencing proceeding. In that second appeal, McArthur alleged the

Appellate Case: 20-1487    Page: 42    Date Filed: 06/01/2020 Entry ID: 4918847

same three guidelines sentencing errors—drug quantity, stash house, and criminal livelihood—that he had alleged as part of his first appeal.

While the second appeal was pending, the United States Supreme Court ruled that the residual clause of § 924(c)(3)(B) was unconstitutionally vague. *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). In light of *Davis*, the government conceded that McArthur's remaining §924(c) conviction (Count 10) should also be vacated. This Court remanded for a second resentencing under the sentencing package doctrine. *United States v. McArthur*, 784 F. App'x 459, 461 (8th Cir. 2019) (unpublished).

In light of the remand for resentencing on all remaining counts under the sentencing package doctrine, the Court did not address the claims of guidelines error.

### G. Second Remand and Resentencing

Following the second remand for resentencing, a Third Revised Presentence Report ("RPSR3") was prepared by the U.S. Probation Office. DCD 1954. The parties again filed written sentencing position pleadings with the district court. DCD 1966 (McArthur's Second Resentencing Mem.); DCD 1968 (Government's Second Resentencing

Mem.). McArthur renewed his objections from the first sentencing proceeding, including his objections to the drug quantity, stash house, and criminal livelihood determinations. DCD 1966 at 6, 17-18. The government continued to support those determinations. DCD 1968 at 2 n.1.

The district court conducted the second resentencing hearing (the third sentencing overall) in February 2020. DCD 1970 (Minute Entry); DCD 1992, Third Sentencing Transcript ("ST 3"). The government moved to vacate McArthur's conviction on Count 2 (Conspiracy to Use and Carry Firearms During and in Relation to a Crime of Violence) in light of *Davis*, and the district court granted that motion. DCD 1968 at 3 n. 2 (Gov't Memorandum); ST 3 at 3 (granting of motion). Accordingly, McArthur now stands convicted of Conspiracy to Participate in Racketeering Activity (Count 1); Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (Count 7); and Distribution of a Controlled Substance (Count 8).

With respect to the guidelines, the district court made the same drug quantity, stash house, and criminal livelihood determinations as

38

in the prior sentencing proceedings, incorporating by reference its earlier rulings. ST 3 at 5-6. The district court again adopted the PSR. DCD 1973, Amended Statement of Reasons at 1. The district court adopted the same total adjusted offense level (level 49, capped at 43) and Criminal History Category (Category III) as in the prior sentencing proceedings. ST 3 at 7-8. The resulting guidelines range of life imprisonment was capped at 960 months by operation of the cumulative statutory maximum penalties applicable to the remaining counts of conviction. RPSR3 at ¶ 416 (noting statutory maximum of 20 years as to Counts 1 and 8 and 40 years as to Count 7, which would yield a total maximum of 960 months imprisonment (240 + 240 + 480)); ST 3 at 8 (noting stating maximum terms with misspoken reference to statutory maximum on Count 7 as 420 months' imprisonment rather than 480 months' imprisonment).

After receiving argument from the parties and allocution by McArthur, the district court sentenced McArthur to 420 months' imprisonment, a supervised release term of five years, and a $300 special assessment. McArthur does not challenge the substantive reasonableness of that sentence. ST 3 at 41-44; DCD 1971 (judgment).

## SUMMARY OF THE ARGUMENT

Wakinyan McArthur was the undisputed leader of a criminal enterprise responsible for violence, witness intimidation, drug trafficking, and a wide variety of other criminal acts. He personally sold and aided his fellow enterprise members in the sale of illegal drugs such as cocaine base and heroin from 2009 until his arrest in 2012.

The district court did not err, much less clearly so, in finding McArthur responsible for the equivalent of 1000 to 3000 kilograms of marijuana – a base offense level of 30. The trial evidence established beyond a preponderance of the evidence equivalent quantities of cocaine base supporting (at least) a base offense level of 30. Nor did the district court clearly err in finding that McArthur maintained a premises for the purpose of manufacturing or distributing a controlled substance or in applying an enhancement for engaging in criminal conduct as a livelihood.

Assuming arguendo that the district court did clearly err in determining the advisory guidelines range, unless such error amounted to an erroneous increase of at least seven offense levels,

40

such error was harmless because the guidelines range would remain

unchanged.

Appellate Case: 20-1487    Page: 47    Date Filed: 06/01/2020 Entry ID: 4918847

## ARGUMENT

### I. The District Court Did Not Clearly Error In Its Drug Quantity Findings.

#### A. Standard of Review

This Court reviews a district court's calculation of drug quantity for clear error. *United States v. Allen*, 440 F.3d 449, 452 (8th Cir. 2006) "Defendants who challenge the sentencing court's determination of drug quantity face an uphill battle on appeal because we will reverse a determination of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made." *Id.* (internal quotation marks and citation omitted). The government bears the burden of establishing drug quantity and sentencing enhancements by a preponderance of the evidence. *United States v. Mannings*, 850 F.3d 404, 408 (8th Cir. 2017).

#### B. The District Court Committed No Clear Error.

The district court determined that McArthur be held responsible for 1000 to 3000 kilograms of marijuana, which generates a base offense level of 30. ST 3 at 5-6 (readopting prior drug quantity finding); RPSR3 ¶ 338. The equivalent quantity of cocaine base (crack cocaine) is at least 280 but less than 840 grams. *See* U.S.S.G. Section

Appellate Case: 20-1487 Page: 48 Date Filed: 06/01/2020 Entry ID: 4918847

2D1.1(c) (drug quantity table). The district court's drug quantity determination was not clearly erroneous.

"[A] defendant is accountable for 'relevant conduct' including 'all acts and omissions committed, aided, abetted, counseled … or willfully caused by the defendant…that occurred during the commission of the offense of conviction." *United States v. Darden*, 70 F. 3d 1507, 1545 (8th Cir. 1995) (citing U.S.S.G. § 1B1.3(a)(1)(A)). "In a drug conspiracy case, the district court may consider amounts for drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." *United States v. Bradley*, 643 F.3d 1121, 1126 (8th Cir. 2011). In a narcotics trafficking conspiracy, "the sentencing court may consider all transactions[,] known or reasonably foreseeable to the defendant," that furthered the conspiracy. *United States v. Payton*, 636 F.3d 1027, 1046 (8th Cir. 2011). Even "[d]rug quantities purchased for personal use by a member of the conspiracy are relevant in determining the total drug

43

quantity attributable to the defendant." *United States v. Walker*, 688 F.3d 416, 422 (8th Cir. 2012).

Further, "in the case of jointly undertaken criminal activity" like the racketeering enterprise here, a defendant may be sentenced for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction. *Darden*, at 1546 (8th Cir. 1995) (citing U.S.S.G. § 1B1.3(a)(1)(B)). Relevant conduct also includes uncharged conduct that is part of the same course of conduct as the offense of conviction and is "a fact-intensive inquiry." *United States v. Ault*, 446 F.3d 821, 823 (8th Cir. 2006).

Trial evidence included overwhelming evidence as to the broad scope of the racketeering conspiracy and McArthur's leading role in it. One aspect of McArthur's enterprise was drug-trafficking. Indeed, one of McArthur's convictions for Conspiracy to Distribute and Possess With Intent to Distribute Controlled Substances (Count 7). The testimony from trial established that McArthur and Wuori were partners in a multi-drug conspiracy that ran unimpeded for over two years. Cooperating witnesses Roberts, Jones, Conway, Carlson,

44

Pindegayosh, Seelye, Hecimovich, and Hollins each testified regarding McArthur's role in trafficking powder cocaine, crack cocaine, heroin, methamphetamine, marijuana, and other drugs. Corroborating this testimony was evidence of numerous quantities of controlled substances seized from various members of the NM, including a controlled buy of crack cocaine directly from McArthur and Wuori in Cass Lake in 2011. The evidence also showed that when McArthur and Wuori's drug trafficking business was threatened, they conspired to eliminate the competition through violence and the use of firearms.

The preponderance of the evidence showed that the quantity of cocaine base alone attributable to McArthur during the conspiracies exceeded 2000 grams, which has a marijuana equivalent of 7000 kilograms. As such, the district court did not clearly err in finding McArthur responsible at least 280 grams of cocaine base, or the marijuana equivalent of at least 1000 kilograms.

The three to four pounds of crack cocaine (TT 5678) that Pindegayosh attributed to Wuori and McArthur adds over 1300 grams to McArthur's relevant conduct. This exceeds the 840 grams necessary to achieve the base offense level of 30 found by Chief Judge Tunheim.

While the government offered a variety of corroborative pieces of evidence, the testimony of a co-conspirator alone may be sufficiently reliable for the court to base its drug quantity calculation for sentencing purposes. *United States v. Payton*, 636 F.3d 1027, 1046 (8th Cir. 2011). But the cocaine base received by Pindegayosh from McArthur and Wuori is only part of the body of evidence.

Apart from Pindegayosh, other trial witnesses provided compelling evidence supporting the district court's findings. Roberts testified that during the conspiracy, McArthur asked him store a 9-ounce quantity of cocaine in Minneapolis and that he brought several crack customers to McArthur, including one who purchased 28 grams of crack cocaine directly from McArthur. He also testified that McArthur and Wuori exchanged cocaine base with each other on "five or six" occasions during the conspiracies alleged. TT 2346.

The district court had the testimony of Dwight Jones who testified that McArthur and Wuori supplied him with crack cocaine between 2009 and 2010 and he recounted 56 grams of crack cocaine transferred between McArthur and Wuori at the "White House." Another witness, Randall Seelye, testified that he, McArthur, and

46

other NM members pooled money to buy powder cocaine in 2009. Then in 2011 while working for law enforcement, Seelye bought 3.5 grams of cocaine base directly from McArthur and Wuori and 6 grams from Wuori at the White House a short time thereafter. Not only did this evidence add cocaine base to McArthur's relevant conduct, but it corroborated the witnesses identifying McArthur and Wuori as partners in NM cocaine base trafficking. Witness Hollins' testimony linked McArthur to Wuori during another 9-ounce cocaine transaction in 2009 and further corroborated witnesses who identified these two NM members as partners in their drug-trafficking activities.

Beyond the government's witnesses, McArthur's own recorded words in 2011 confirmed the joint nature of McArthur and Wuori's drug-trafficking operation. In the June NM council meeting that year, McArthur admitted that he and Wuori had been sharing multiple sources of supply. Exh. 764.

On this considerable record, McArthur's assertion that the district court clearly erred should be rejected. McArthur makes the assertion, in largely conclusory fashion, that he should be held responsible for only the lowest possible quantities in the range found

by the jury—one gram of cocaine and 28 grams of cocaine base with a corresponding base offense level of 24. McArthur's Br. at 21 (asserting there is "little evidence" supporting a finding beyond the low-end of the jury's range). McArthur essentially ignores the testimony of witnesses like Pindegayosh, Jones, Roberts, Hollins, Carlson, Conway, Seelye, Lueck, and Hecimovich. He also ignores the body of evidence showing that McArthur knew of, encouraged, aided, then rewarded his co-conspirator's drug-trafficking activities, including those of Wuori.

Guidelines § 1B1.3 addressing relevant conduct for sentencing applies to a participant like McArthur who "understands the full extent of the conspiracy." *Ramey v. United States*, 8 F.3d 1313, 1315 (8th Cir. 1993). McArthur understood that drug dealing was part and parcel of membership in the enterprise he oversaw. McArthur encouraged his gang members to "put in work" because everyone was expected to contribute to the enterprise in one fashion or another. The evidence presented during trial amply demonstrated that no defendant in this case understood the full extent of the NM racketeering and drug-trafficking conspiracies better than McArthur. The district court's finding that McArthur was responsible for the

48

equivalent of over 1000 kilograms of marijuana was not clearly erroneous. Its judgment should be affirmed.

## II. The District Court Did Not Clearly Err In Finding That McArthur Maintained A Premises For Manufacturing And Distribution Of A Controlled Substance.

### A. Standard of Review

This Court reviews a district court's factual finding that a defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance for clear error. *United States v. Garcia*, 774 F.3d 472, 475 (8th Cir. 2014).

### B. The District Court Committed No Clear Error.

The district court's decision to apply the premises ("stash house") enhancement was based upon a large body of corroborated evidence. Numerous cooperating witnesses testified at trial that they frequently observed McArthur and Wuori engaged in drug-distribution activities the White House on Maple Avenue in Cass Lake, Minnesota during the time frame of the conspiracies alleged. The district court committed no clear error in applying the stash house enhancement.

Guidelines § 2D.1.1(b)(12) recommends a two-level increase if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." Application

49

Note 17 states "[s]ubsection (b)(12) applies to a defendant who knowingly maintains a premises (*i.e.*, a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution."

Application Note 28 to § 2D1.1 instructs that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes."

The trial witnesses familiar with the enterprise testified that McArthur and Wuori used the White House for cooking powder cocaine into crack cocaine, as well as for packaging and distributing drugs. Jones, Roberts, Seelye, Conway, and Pindegayosh all described how Wuori and McArthur used the home on Maple Avenue to store

50

narcotics and how Wuori frequently used the microwave oven in the kitchen of this house to cook the powder cocaine into cocaine base, which was then distributed to NM members. TT 2346-48, 3745, 4580-82. McArthur and Wuori also used this house to discuss with other NM members the shooting of a rival drug dealer. TT 4607-08. Those witnesses also testified that the home was frequented by many members of the NM and that firearms were often present. A drug-trafficking expert from the Minneapolis Police Department testified that firearms are commonly used by those involved in drug trafficking for protection. TT 5936. Clearly, "[t]hese drug distribution activities were more than an 'incidental or collateral' use of the premises…" *United States v. Miller*, 698 F.3d. 699, 706-07 (8th Cir. 2012).

McArthur encouraged members of the NM to use his residence to prepare drugs for distribution. McArthur stated on tape: "I got a crib, niggers could stay in my crib, they can fuckin' cut their shit up nigger, if they bring any dope in the crib though, in my house, and the-and the cops come in, they gotta take the rap for that, you know what I'm saying? Don't-don't put it off on me, our-(IA) we'll put you on your feet nigger." Exh. 499; RPSR3 ¶ 269. Further corroborating the

51

testimony about the White House was the evidence recovered in the document warrant in 2011, which included NM t-shirts, financial documents of NM members, police reports from NM-related crimes, the personal property of several different NM members, and a mailing to McArthur himself from federal inmate and NM member Anthony Smith in which Smith discussed NM-related business. TT 4769-74; Exh. 712 (mailing). McArthur was one of two individuals present at the house when officers executed the warrant. TT 4765-66.

Indeed, even McArthur did not deny a connection between his drug-trafficking and the White House. In responding to a series of questions about the execution of a search warrant at the White House in February 2011, McArthur admitted in his trial testimony there were a "host of a people" that would know that he stored distribution quantities of marijuana at this residence at any given time. TT 6623-24. Although law enforcement did not encounter those quantities when executing the warrant, McArthur stated about the premises that "if [law enforcement] had the right intelligence, they could have caught me." TT at 6625.

52

Viewing the record as a whole, it is clear that one of the primary or principal uses for the White House was McArthur and Wuori's substantial NM-related drug trafficking activities. McArthur seems to concede that the record reflects substantial drug-trafficking activity at the premises, but he assets that others were responsible for the premises and the trafficking activity. McArthur Br. at 26-29. As is noted above, however, there was evidence, by far more than the required preponderance, that McArthur and Wuori together maintained the White House for a primary purpose, among others, of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution. The district court's appropriately relied upon that evidence. DCD 1548, ST 1 at 103 ("There is abundant evidence that the house at issue was used for distributing drugs, storing drugs, cutting drugs. There was plenty of testimony concerning that."); DCD 1992, ST 3 at 5 (reiterating stash house finding). The district court's finding that McArthur maintained a premises for the purpose of drug

53

manufacturing and distribution was not clearly erroneous, and its judgment should be affirmed.

## III. The District Court Did Not Clearly Err In Finding That McArthur Committed The Offenses As Part Of A Pattern Of Criminal Conduct.

### A. Standard of Review

This Court reviews a district court's factual findings regarding the criminal livelihood enhancement for clear error. *United States v. Berry*, 930 F.3d 997, 999 (8th Cir. 2019). Application of the guidelines to the facts is reviewed de novo. *Id.*

### B. The District Court Committed No Clear Error.

The record before the district court demonstrated that drug trafficking was McArthur's primary occupation during the racketeering and drug conspiracies alleged. The district court committed no clear error in determining that McArthur committed his offenses as part of a pattern of criminal conduct engaged in as a livelihood.

Guidelines § 2D1.1(b)(15)(E) subjects a defendant to a two-level increase in the advisory guidelines range if the offense was committed as part of a pattern of criminal conduct engaged in as a livelihood. The technical element of this enhancement is that the defendant's illegal

54

income must have exceeded 2,000 times the hourly minimum wage under federal law during any twelve-month period.  U.S.S.G. § 2D1.1, Application Note 20(C), *citing* U.S.S.G. § 4B1.3, Application Note 2.  During the time period at issue, the federal minimum wage was $7.25 an hour.  29 U.S.C. § 206(a)(c).  The Probation Office recommended this two-level increase, noting "the Native Mob was the defendant's life.  As the leader of the Native Mob he ensured fellow gang members sold drugs and engaged in violent criminal acts to maintain his leadership and lifestyle throughout the conspiracy."  RPSR3 ¶ 344

The Probation Office noted that McArthur had reported income of $2,406 and $17,966 in 2008 and 2009 respectively.  *Id.* at ¶ 411.  The Probation Office also determined that McArthur did not file a tax return in any of the years between and including 2008 and 2012.  *Id.* at ¶ 414.  McArthur reported to probation having no assets and no liabilities and a credit report revealed no credit history.  *Id.* at ¶ 413.

Trial evidence showed that during the conspiracies alleged, McArthur and Wuori charged between $40 and $70 per gram of cocaine base.  For example, McArthur charged $250 for 3.6 grams of crack cocaine ($71 per gram) (*see* TT 4807-4808, Exh. 940A) but when

55

sold in larger quantities, the price dropped to approximately $46 per gram. TT 2355. As set forth above, McArthur's relevant conduct as to cocaine base alone exceeds 2000 grams. Using these prices and quantities, McArthur's untaxed income from cocaine base alone ranged from $92,000 to $140,000. Dividing by the 3 years that McArthur was not in prison (February of 2009 through arrest date of February 2, 2012) results in an average income of between $30,600 and $46,600 per year – figures all in excess of $14,500 (2000 x $7.25/hour minimum wage) even considering the "half and half" split with Cass Lake NM "Rep" Chris Wuori ($15,300 to $23,300). Notably, these figures do not include the income generated by his sales of pills, powder cocaine, heroin, and any other illegal drug.

Beyond the income generated by the sale of cocaine base and other NM drugs, McArthur himself testified that he made money following release from prison by selling "probably over 100 pounds" of marijuana (TT 6402) and some of that was with fellow NM member Jeremee Kraskey. TT 6466. He further acknowledged that he and

56

Wuori were very close – describing him as "a little brother" – and that they shared money and traveled together. TT 6437-38.

When asked about legitimate income, McArthur noted that he briefly held a job given to him by the tribe, but lost it when he violated his parole and was sent back to state prison. TT 6399. When McArthur was asked what he did with the proceeds from his drug sales, he testified that he bought clothes, jewelry, and traveled. TT 6437. McArthur also admitted that he used money from selling marijuana to purchase equipment to create a recording studio. TT 6475. Proof of McArthur's recording studio can be seen in the government's trial evidence. Exh. 824; TT 5530-31.

The record accordingly demonstrated, beyond a preponderance of the evidence, that McArthur derived income from his racketeering activities that exceeded 2000 times the then-existing hourly minimum wage of $7.25 an hour. Any alleged absence of detailed evidence identifying precisely how much money McArthur earned while participating in the racketeering and drug conspiracies is not fatal to the district court's determination. *See United States v. Morris*, 791 F.3d 910 (8th Cir. 2015) (evidence that leader of drug conspiracy had

no reported income, had sold large quantities of methamphetamine each week, and had made rent payments and several large purchases was sufficient to support the enhancement under Section 2D1.1(b)(15)); *see also United States v. Hawkins*, 866 F.3d 344 (5th Cir. 2017) (sentencing court can infer from facts in the record that criminal conduct was defendant's primary occupation where defendant did not hold a job outside of the conspiracy and was linked to substantial drug trafficking).

## IV. Unless The District Court Cumulatively Erred By More Than Six Offense Levels, Any Error Is Harmless.

At the Category III criminal history applicable to McArthur, the advisory guidelines range is life imprisonment unless the total offense level is 42 or below.[22]  Here, the district court found a total offense level of 49.  ST 3 at 7-8.  For McArthur to be subject to an advisory

---

[22] As is noted in the procedural history section above (*supra* at 39), McArthur's advisory guidelines range in the resentencing underlying this appeal was 960 months' imprisonment, rather than life, by operation of the cumulative, statutory maximum terms of imprisonment applicable to McArthur's remaining counts of conviction.  The statutorily-capped range of 960 months' imprisonment does not affect the analysis below, as the same 960-month range (rather than life) would apply to any guidelines determinations resulting in a total adjusted offense level of 43 or higher.

58

range of less than life imprisonment (as capped by applicable statutory maximum terms of imprisonment), the adjusted offense level would need to be reduced by seven (7) levels, to an offense level of 42, where the range decreases to 360 months to life imprisonment.[23]

To reduce his advisory range by seven or more levels, McArthur would need to prevail on his claim as to drug quantity (he claims a six-level error) and at least one of the other two challenged enhancements (the stash house and the criminal livelihood enhancements added two levels each). Otherwise, McArthur's advisory range would have remained the same. Thus, absent cumulative error comprising seven or more offense levels, any guidelines error here was harmless.

When a defendant preserves a guidelines challenge, this Court reviews for harmless error. *United States v. Martinez*, 821 F.3d 984, 988 (8th Cir. 2016). There may "be situations where an error in calculating the appropriate guidelines range is harmless and, therefore, does not require remand." *United States v. Mashek*, 406 F.3d 1012, 1017 (8th Cir. 2005). The United States Supreme Court

---

[23] The range would be 360 months to 960 months for McArthur given the statutory maximum terms.

Appellate Case: 20-1487    Page: 65    Date Filed: 06/01/2020 Entry ID: 4918847

has stated that "remand is required only if the sentence was 'imposed *as a result of* an incorrect application of the Guidelines.'" *Williams v. United States*, 503 U.S. 193, 202-03 (1992) (quoting Section 3742(f)(1)).

Absent error in offense level calculations of seven or more levels, error in calculating McArthur's advisory guidelines range is harmless. This Court's decision in *United States v. Sykes* is dispositive. In *Sykes*, the guidelines error alleged by the defendant would not have resulted in any change to the advisory range, which would have remained at 360 months' to life imprisonment even if defendant prevailed on his claims. *United States v. Sykes*, 854 F.3d 457, 462 (8th Cir. 2017). The Court concluded that "even if we accept the entirety of [the defendant's] arguments regarding the drug-quantity calculation and concluded that the district court erred, such error did not substantially influence sentencing because the district court nonetheless arrived at the proper Guidelines range." *Id.* Absent a seven-level or greater offense level error in this matter, the district court would have arrived at the same range, and, like in *Sykes*, any error would be harmless.◄

## CONCLUSION

For all the foregoing reasons, the district court's judgment should be affirmed.

## CERTIFICATE OF COMPLIANCE

The undersigned attorney for the United States certifies this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief has 11,236 words, proportionally spaced. The brief was prepared using Microsoft Word 2016. The undersigned attorney also certifies that the brief has been scanned for viruses and, to the best of our ability and technology, believes it is virus-free.

Dated: May 29, 2020

ERICA H. MacDONALD
United States Attorney

*/s/ David M. Genrich*

By: DAVID M. GENRICH
Assistant U.S. Attorney
Attorney ID No. 0281311
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600

Attorneys for Appellee

Appellate Case: 20-1487    Page: 67    Date Filed: 06/01/2020 Entry ID: 4918847